May it please the Court, my name is Jay Russell and I am a Supervising Deputy Attorney General at the California Attorney General's Office. Defendants and appellants have made this motion to stay the District Court's September 16th order primarily because that order is based upon, or there is no admissible evidence that supports the wide-ranging order directing defendants to oversee county jail operations. The order violates the Prison Litigation Reform Act and the order violates the Tenth Amendment and principles of federalism. And when we look to the bases for a stay of this order, staying the order until further consideration by this Court will cause little or no injury to the plaintiffs and appellees in this case. The class members in particular who are affected by this order are … What's the injury to the State if the order is not stayed? Your Honor, the State has been ordered to create, and to create very quickly, a very wide-ranging detailed order, excuse me, a detailed plan that provides for oversight by the State of California of county jails. And particularly what the defendants have been ordered to do is create a plan whereby the State and the California Department of Corrections and Rehabilitation will oversee and enforce federal law against county jail administrators, namely the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. And so for the defendants to do that, to create that plan, doing so is essentially tearing into State resources. What's the result, essentially, of years of developments? And there was a 2007 order wasn't there, and it was just now on appeal, and then there was … This doesn't seem to have been precipitous, was it? Well, what's happened is this order that was issued on September the 16th requires a plan, which presumably will be implemented, that goes far beyond anything … But weren't you asked much earlier to come up with a plan that didn't materialize, and that's why this is a more detailed order than earlier orders? But it's not a departure, is it? I would submit that there has been no previous order requiring State oversight of county jail operations. The prior orders … That's a pretty broad statement that they have to oversee the State's … the county jail's operations. What is it specifically? As I read the relief ordered by the Court, there was not very much that you had to do. That's why I was concerned about what was all of this oversight. As I said, there are about four points, and one of them isn't applicable if the jails have a grievance procedure. And what is it you have to do? I understand you're bothered about within one day of the arrival. You think that's too short a time that you have to check the system and talk to the parolee to see whether he has disabilities. That's one. The second has to do with accidents to grievance forms. The third is if they become aware of disabled people housed in the jails who are not being accommodated, they have to take steps to get the county to accommodate them. And the fourth is if there's a pattern of non-accommodation, they have to notify the jail and generate a plan to remedy it. But how is that overseeing the operations of the jail? Well, Your Honor, what the plan has ordered is for defendants to … Essentially what it will cause defendants to do is to create a new division that will require them to review, either institute their own grievance procedure for inmates in county jails, or to the extent that there is an acceptable grievance procedure at the county jail, to review each and every of those grievances to determine what accommodations, if any, were provided. There may be instances in which a grievance is denied for good reason by a county jail administrator. Presumably, if the defendants see a, quote, pattern of disability, which is undefined within the order, the defendants would have to step in and second-guess the decisions being made by those county jail administrators. And to the extent that the defendants find any kind of a pattern of discrimination, again, which is undefined, that needs to be remedied. And, again, I'm not quite sure whose determination of remedy would be necessary. That presumably is why you're going to … we're asked to make a plan. In other words, to deal with those questions that you're saying you're not sure what they are. If you put them in your plan, then you'll know what they are. We can do that. But even to the extent … well, that can be defined within a plan that is to be developed. But that plan does require each and every one of the elements that I've talked about. Of course, the defendants will try to define those terms that remain undefined within the order. But it is indisputable that the order requires the defendants to create such an oversight procedure. Well, you know, all this goes to the merits of the order and the merits of the plan. And I think they are obviously important questions, and the merits will have to be reached at some point. But you still haven't answered my question. What's the irreparable harm to the State if the State is not granted? Well … Spending money? Yes. In preparing the plan? And we have cases that say, you know, spending money is not an irreparable harm, right? Well, Your Honor … What else besides spending money is a harm to the State? Well, the harm now is the resources that are being devoted by the State to creating a plan … Well, not only spending money, it's drawing manpower and hours and oversight from other operations of CDCR. For example, this is not the only plan that CDCR is working on right now. CDCR is required in various instances and in other cases to come up with … By the way, by the way, let me stop you for a little clarification. You just mentioned something that triggered something in my mind. Remember, early on, years ago, this case was sort of bifurcated into, I'll call it, the CDC half and the parole board half, right? Yes. Now, does this order involve the CDC or the parole or both? Well … Who is it directed at? That's not defined within the order, Your Honor. But after having reviewed it, it appears that it is directed to primarily the division of adult parole operations, which would be … What you're talking about, the reason I ask you, you're talking about all these people in CDC would be diverted from their other duties, right? Unless you hire other people. I bet there are a lot of people looking for work. The State could hire other people, but this plan is required … Well, you talked about $22 million that you were going to spend. What's that for? That would be for implementation of this plan. What does that mean, implementation? Where are you spending $22 million to implement it? It would be the creation of a new division to oversee county jail operations. What does that mean, creation of a division? You mean to write on a piece of paper, here's a division? Who's going to be in this division? Well, it would be the people who have to go out and visit with … Are those current employees or new people? No, it would have to be new people.  No, wait a minute, seriously. At least scientists … You say new people, but the plan you submitted says you plan to use existing staff. To the extent that we can. Well, that's not what it says. You say you don't know whether … But your claim, what you claim your injury is, is you're going to have to spend $22 million. Now you say in the plan that you plan to use existing staff, and you don't know whether you'll have to hire anybody. So there goes your $22 million. Well, Your Honor, to the extent that the defendants are required to meet with each and every inmate, every class member inmate, within one business day period of time, and then convey information to the county jail administrators within a three-day period of time, and then either institute its own grievance process or oversee the grievance process of 58 California counties, and also monitor the operations and the provision of accommodations at over 180 counties. I mean, I have all of those facts, except that in the plan that you submitted, you say you're going to use existing staff. And then you say, well, it's going to cost us $22 million. And I said, for what? Well, Your Honor, depending upon how the final provisions of the plan are drafted and what is allowed by the district court, I would submit that if defendants are required to meet with every class member within a 24-hour period. Well, then why did you say in your plan that you submitted that you plan to utilize existing staff? I mean, we're here on a stay. Yes. Now, it would seem, if we read your draft, that you're not going to have those damages or those costs. Your Honor, to the extent that That's what you said in your draft. Yes. That is a draft plan. It hasn't been finalized. Okay. If the draft is not finalized, then you can't tell us in a stay we're going to spend $22 million. Because your draft is you won't spend anything. Well, while the plan is being drafted, Your Honor, the plan itself is being drafted by existing personnel of CDCR. But the injury, it's a two-fold injury to the defendants, which is the reason why we're asking for a stay, is that, first of all, just the very process of drafting the plan requires a substantial devotion of resources to be able to do that. But you're done with that. Or you're supposed to be done with that. The draft plan was completed on Monday. The final plan is to be, I believe that the words are issued and disseminated to the counties on November the 16th. I thought the final plan was supposed to be finished on Monday. You had 15 days before that to give it to the plaintiffs. We have provided something to the plaintiffs. Again, under the terms of the order, the defendants provided a plan which they hope will be their final plan on Monday. But that is to be whatever is deemed to be a final plan is to be disseminated, is to be issued and disseminated. As to the specifics, is your biggest gripe the one-day time period? I think that your plan essentially is not to do it in one day, but to do it in three days. Is that the plan? That's been a proposal. That's in the draft. That's in the draft. We don't know if that's acceptable. And then what do you do with this draft now? It's up to the plaintiffs to give you feedback? It appears that way from the terms of the order, of the September 16th order. We've requested from plaintiffs, and plaintiffs have agreed at this juncture that they can provide further comments on this proposed plan by November the 20th, I believe that it is. And then what if they say to you, look, the three days isn't acceptable. We need one day. Can you go back to the district court and say, will you resolve this dispute? We would ask for reconsideration, but I think that this Court's order is a final order that requires that it be, that it have a provision whereby defendants meet with all of the class members within one day. All right. Well, suppose they were to say, all right, fine, do it in three days. Then where does your money come from? I mean, the only thing specific in this plan that suggests that there's some sort of a resources problem is the one-plan day versus the three days. Beyond that, what other problem do you have? Well, to the extent that there's not an acceptable grievance procedure at each of the counties, defendants will be required to create a new grievance procedure for the county jails. It won't, of course, none of what we're talking about here are inmates within CDCR facilities. These are people in county jail facilities. So if the county jail grievance procedure was to be created for the county jail facilities, that would be a new grievance procedure. But there are people in the county jail facilities because you put them there. Pardon? Because they're in county jail facilities pursuant to a State parole revocation. That's correct. Under penal code section. Awaiting State proceedings. Pardon? Awaiting State proceedings. Awaiting State proceedings. That's correct. They're placed there under penal code section 4015, which obligates county sheriffs to accept inmates from a controlling authority, which, among other persons, would be a parole officer. But they're being held there pending further revocation proceedings. Do you want to address the likelihood of success question in terms of it? I mean, you've raised what your likelihood of success is. I understand we've been talking largely about irreparable harm, but you've made an argument where you're attacking a Federal regulation. I don't know if you're still taking that position. Are you? Yes. And some others. So that's one legal question. And what else? Well, Your Honor, in addition to the regulation being ultra-virus, we believe that the order itself violates principles of Federalism and the Tenth Amendment. What this order requires the defendants to do is to oversee and requires the State to oversee county operations and to the extent that the counties are not complying with the Federal law to impose fines and penalties. And defendants submit that just as they are obligated to provide or to make reasonable modifications to program services and activities under the Americans with Disabilities Act, so also are the county jails required to provide those same reasonable modifications. So to the extent that a county jail inmate, even if they've been put back in county jail by a parole officer, to the extent that their ADA rights are being violated, there is a robust and I would submit immediate remedy for that inmate. They can sue the county for those ADA violations. And they could, to the extent that those are pervasive violations, they can sue. Well, it's not a very satisfactory remedy for people who are handicapped, who are in a place where there aren't facilities for them, to be able to sue the government and go through five years of litigation. That's not exactly the kind of remedy that the Court reasonably wants. But what kind of fines and penalties are there? Well, again, that's undefined by the order, Your Honor, but that is expressly within the order that the defendants are supposed, to the extent that they find patterns of disability, that they are to assign a staff person to investigate the county jail facility, report back to the defendants within 30 days, provide a copy of that report to plaintiff's counsel regarding the pattern and the steps to be taken to remedy it, presumably by the county jail, including monetary fines and penalties for continued violations. So what you have is you have a district court ordering a state to enforce a federal law against county jails. Except for the fact that they're only in the county jails, pursuant to your program, not theirs. That's correct. Besides which, the counties, of course, are subdivisions of the state, so and so. And as you pointed out, the reason why they have to take these people is because of a statute that says they have to take them if you tell them to. So essentially they are irregents at that point. Well, people go to county jail for various reasons. They do, but not in this instance. In this instance, this only is running to you because you being the state is the responsible entity that is placing these people in the county jail and making them stay there. So the fact that that's where they're living, they could be living in a hotel, but you're the ones who have chosen where they're living. You have control over where they're living. And all this is doing is saying if you put them in a hotel, it will be your problem. If you put them in a county jail, that's your problem, too. Well, I would submit that that is the extent of the order. I mean, for example, I mean, under the logic of this order, if a parole agent were to tell a parolee, well, I think the place that you need to live, in fact the place that you have to live because of various laws within the state of California, is this particular resident's hotel. Yeah, well, that's right. But if the state puts a prisoner in a hotel, it's got to make sure that that hotel can accommodate the prisoner's disabilities. That doesn't sound so odd. But that hotel is likewise subject to the ADA under Title III. Yeah. And there would be, again, a robust remedy for that. I don't know about this robust remedy. The hotel may be violating the law. That's their problem. But you can't put your prisoner in that hotel unless they have the accommodations. It's your prisoner, and you're supposed to comply with the law, and you can't put them in a place where his disabilities can't be accommodated. That's the effect of that regulation, isn't it? Pardon? That's the effect of the regulation. Well, Your Honor, the regulation provides that an entity cannot avoid its obligations under the ADA through contracting, licensing, or other agreements. And here, if we go to the analogy of the hotel, there's no contract. There's no contract, there's no license, and there's no agreement. But there's another arrangement. Pardon? So then there's another arrangement. Who's paying the hotel to take this prisoner? Well, presumably, the inmate would be, or the parolee would be paying that hotel. No, no, no. My hypothetical is not that. My hypothetical, or who's paying the jail? You're paying the jail. The State reimburses county jails for the costs of holding parolees. Exactly. Exactly. You know, that raises another question, which I sort of had back in my mind in this case, is that, you know, at least in the 11th and Lemon area, there's not an extensive body of case law, but some cases that discuss when and under what circumstances a county, including county sheriff, is acting as a local entity or as part of the State, right? If it's part of the State, you know, I mean, you don't have much of an argument about delegation. It's just another State department, right? Have you thought about that, whether the sheriff, when they, you know, are required to accept prisoners under PC 4015 is just actually a part of the State itself? Well, Your Honor, if I understand your question correctly, that is... You know the case that I'm talking about. I'm not quite... In the California Supreme Court, my recollection is that we, the Ninth Circuit, held that the sheriff is not necessarily the State for certain purposes, but the California Supreme Court held that it is after that. At least under some circumstances. Yeah. Well, Your Honor, I would submit that the situation here is a little bit closer to the Prins case that we cited in our reply brief. And what's happened is the district court has deputized the State. I would say it's actually the other way around. What's happened is the district court has deputized the State to enforce the ADA against county jails. No, the district court is telling you that you have to comply with the ADA in terms of where, what happens to people when parole is revoked. And if you then choose to put them in some housing, which in your view belongs to someone else, although that's even questionable since it's a subdivision of the State, that's your problem. That's all she's saying. There's nothing in the district court order that requires the State to send its, you know, parole violators to county jails, right? That's the choice of the CDC or the Parole Board. That is correct, Your Honor. You could take them, you know, straight to state prison if you had the room. That is correct. And in fact, that's. So it's your own choice that you're doing that. Well, that was considered by the State legislature in the 80s. And rather than building 58 holding facilities for each of the counties, it was determined that the most efficacious way of retaining these parole violators was to put them in county jails. And because the counties are subdivisions of the State, it was possible to simply say to the counties, okay, you have to take them. But if there was some third-party bystander, you couldn't do that. But in this instance, you could because it's not really a separate entity anyway. Well, but it's a separate entity for purposes of the ADA. The county jails, just as defendants in this case, are subject to the ADA. And when you look at Title II, what we're talking about is the provision of programs, services, and activities by a governmental entity, by a governmental entity, which is exactly what Section 12-132 says. So what you have is you have the State placing parolees in a county jail facility, which is a public entity, which is likewise subject to Title II of the Americans with Disabilities Act. So the State can rightfully say, we are going to put these parolees in the county jail facility because just like us, the county jails are likewise subject to the ADA. And to the extent that someone's rights under federal law are being violated, and if they're being violated in a pervasive manner, they can sue, and they can sue on behalf of a class, as we've seen, for example, in the Pierce v. County of Orange case. Except that it's your responsibility, wherever you put them, it's your responsibility to see that their disabilities are accommodated. I don't see what difference it makes that the individual could sue the county. You know, the State, they're the State prisons, and I don't see how you get out of your responsibility to see that their disabilities are accommodated by saying, well, I put them in a place where they don't care about the law. But, well, Your Honor, to the extent that they've put them in a county jail, the defendants recognize that that county jail, whether they care about the law or not, is subject to the law. That may be, but there's been 20 years of litigation, or I don't know how many, 15 years of litigation on this case against the State, not against the counties, and a determination has been made about what the State needs to do to comply with the ADA, right? Yes. And now you're saying, but that's what 15 years of litigation is all for naught in terms of this subgroup of people, because we've decided to hand them over to an entity that isn't covered by this order. That's essentially what you're saying. Well, Your Honor, to the extent that the case is about defendants providing reasonable accommodations in program services and activities, I would submit that there is substantial evidence, even in this very motion, that the defendants are doing that. If you look at the declarations, you'll see that accommodations have been provided within CDCR facilities. What we're now talking about is not the provision of reasonable accommodations within CDCRs, within defendants' facilities, but within the facilities of third parties. So your position would be that if you were to contract for the building of a bunch of private prisons, and this is not a silly hypothetical, and did nothing to see that, and you placed people in those prisons and did nothing to see that they were accommodated under the ADA, that would be okay. And it wouldn't be covered by this order, by this 15 years of litigation at all. That has to be your position. Not necessarily when it involves a private party. What we're talking about here is the application of Title II. I understand that. Both to the defendant as well as to the county jails. Okay. And so because Title II applies just as much to the county jails as it does to the defendants. Well, it would apply, too, to a private party that's acting on behalf of the State. Like, for instance, the Corrections Corporation of America, right? You can contract with them, you know, to hold your parolees, and they'll be subject to Title II. Well, to the extent that there's a contractual provision for that, I would agree, Your Honor. And, in fact, that was raised in this very motion. There are contractual relationships between Sacramento and Alameda County and the State, and the State does the State seeks to enforce those contractual provisions. And to the extent that the county fails to provide reasonable accommodations under the ADA, and the State, for example, would get sued for that, I believe that there would be an identification provision under the contract. The State would drag the county in on the contractual provision. But that's – but there is no contractual agreement here between the counties and the State. Well, but you are paying money to house your prisoners to the counties. We reimburse the counties. The defendants reimburse the counties. Who sets that reimbursement rate? It's a daily jail rate, I believe. It's part of the penal code, Your Honor. Let me get back to, you know, where we started, because I'm still interested in the stay motion. I want to ask you two things. One, well, one question that goes to two different matters. One, at what point, you know, how many days or weeks away do you think you're going to start eating into this $22 million, you know, at a serious clip? That's number one, because I ask that not only in terms of harm now, but in terms of – do you have a briefing schedule on the underlying appeal yet? I'm sorry, Your Honor? Do you have a briefing schedule for the underlying appeal? Yes, we do, Your Honor. The appellant's brief is due, I believe, January 16th. All right. Would you like an expedited schedule? No, that is not on it. Even if you don't get a stay? Well, that's what I'm getting at. Well, we may seek an expedited schedule if the stay is not due. Well, so then answer my – can you answer my question? At what point of time are you going to start eating into, in a serious manner, this $22 million? That's not defined within the order, Your Honor. I would submit that it will be very soon. How can you say that if you said you don't know whether you're going to hire people? You're going to try to do it with your existing people, you said, right? That is – that's the draft plan, Your Honor. Yeah. The plaintiffs say, and I will ask them, I don't know if it's true, but I thought they said that you all – that you, meaning the CDC, or maybe it's the parole board, has – already has people on every site. Is that not true? It is. It is. Already has people present at each site because they have to do various things. They have to give them notices and they have to arrange hearings and so on. That is correct, Your Honor. So there already is at least somebody at each site? That is correct. Those are under the provisions of the Valdivia litigation, yes. Okay. And those people can't do these fairly ministerial acts? Well, if they're fulfilling their obligations under Valdivia, they probably can't fulfill their obligations under this particular order if they're required to be out there within a one-business-day period of time. All right. Suppose it was three business days, as you propose. That's why I keep coming back. Because the one specific thing you said that sounds like maybe there's something in it is the one business day. So why does that change to three business days? It might make a difference, Your Honor, but – and we have proposed that. The defendants have proposed that to the plaintiffs. I don't know what the response to that is. Although it might not make a difference. It might not make a difference if we look at the logistics of what it takes. I mean, one of the problems the defendants have in this case is that the order obligates them to meet with a parolee within one business day. Let's say that even were changed to three business days. What I'm advised is there are many instances from – I'm up in San Francisco, and what I've been told is, for example, if somebody is held on a parole violation, that they may very well go to 850 Bryant Street, which is the Hall of Justice in San Francisco. And they may only stay there for a 12-hour period of time. And then they will be transferred to the county jail facility in San Bruno. And because Sheriff Hannessy has significant overcrowding problems at that county jail, he in many instances might transfer that inmate to either Santa Rita Jail or DVR, the Dual Vocational Institute, over in Tracy. And they might move that person within one day back over to San Quentin, and within a day or two after that, that person might actually ultimately get transferred back to either the Hall of Justice or the jail facility in San Bruno. So maybe it's not a very good idea to treat disabled people that way, even though you can treat 95% of your prisoners that way. Maybe it would be a good idea to see whether somebody is disabled and not move them around to five jails in two days. Well, Your Honor, again, those aren't decisions that are being made by CDCR. In some instances, those are decisions that are being made by the county jail. Well, I know, but you can talk to the county jail. Sheriff Hannessy is a very reasonable person. You can talk to him and say, look, why don't we work out a way that we can comply with his statute. You know, that's why the court said to you, you work out a system, a plan, because you can work out a reasonable plan. Nobody is saying to you, you have to tell Sheriff Hannessy what to do. But, you know, one of the things you might consider when you do a plan is, should we talk to Sheriff Hannessy and say, look, there's a real problem with disabled people. Can we work out a system for handling them so they go to a place where there are facilities? Well, Your Honor, to the extent that Sheriff Hannessy agrees to those things, and Sheriff Hannessy, of course, is one sheriff out of 58 counties. But he's the one where he might do it to five jails, and some of the other counties don't have all those jails. But to the extent that Sheriff Hannessy or any other sheriff doesn't cooperate, the defendants are obligated to enforce the ADA against that county sheriff or the county jail administrator, including the imposition of fines and penalties. Okay. Well, I think we've about doubled your time almost. Your Honor, I have been looking at the clock here. I would ask, and I apologize for not stating this at the very beginning, if I could have a couple minutes of rebuttal.  Thank you. Please be seated. May it please the Court, my name is Michael Bean, and I'm here on behalf of the plaintiff's class in the Armstrong case. I think one thing that emerged from the argument so far today is how much further the proceedings have to go before they're ripe for review. We don't have a plan. This Court does not have the plan that was provided to plaintiff's counsel a day or so ago, which is different from the plan that was provided to the Court a couple weeks ago. That's because we're actually negotiating, which is a good thing. We've also, as counsel mentioned, agreed to meet and discuss further changes to the plan in two weeks. So when's the plan going to be implemented? Okay. Well, these plans, and the district court correctly acknowledged that, see, they have a date for dissemination of a plan to the counties. Sure. But it's up for the defendants to come up with an implementation schedule. So, for example, the plan they provided to us earlier this week provides that some of the aspects of the plan are going to take several months because they have to get money to change their computer system. We, of course, understand that process and would be agreeable, and so would the district court. The district court order also says if you can't work something out between the plaintiffs and defendants, please come back and I'll resolve it. And, in other words, this is the appropriate way that the district court handling a complex case. What you're really saying is nothing's going to happen on November 16th anyway, and it's really not an emergency. That's correct. That's the bottom line. That's the bottom line. That's correct. This is a process that... Well, let me ask you this. Is the plan going to be distributed to the counties on November 16th? That is the current court order. Yes. What's... I'm asking you now what is going to happen. Well, the State has requested that we give them an extra two weeks, and we said, if you'll meet with us and discuss some things, and they said yes. So I assume what we'll do next is prepare a joint stipulation and ask the district court if she would permit an extra two weeks before the plan is disseminated. So that only takes us to November 30th. But you're also saying that even when it's disseminating, it doesn't mean it's going to happen. Well, it's a plan. In other words, they've already issued a letter to the district to the county jails saying, here's the district court order. We have to enforce the ADA. We're giving you notice. We'll be back in touch with you with a plan. That's already happened. There is this... If the court, as we urge the court to do, declines a stay and allows this process to move forward, the process will occur where the parties will negotiate. The district court will resolve any differences. And then, if there's still something that the state complains about, and, by the way, I don't know if there really will be, then there will be a final reviewable order that you'll see a complete order. Here, we have something that's a moving target. Now, let me ask you this. If you negotiate for, say, two weeks, and you don't arrive at something, and you then go back to the district court, is the state obligated to go forward in that time period, and if so, with what? The way I read the district court order, and I think it's based on her experience, that we don't always work every little detail out. The order says that the state should go ahead with what they agree to do, disseminate that, even if there's something in dispute. And then, if there's something in dispute, she'll resolve that later. But she wants to begin the process, have it start. And I think it's important. Well, let's say, for example, what Judge Perezowne suggested was seen to be the primary dispute, although I recognize there are others, but the most evident dispute is one day, three day. Let's assume that's not resolved. Do they have to implement that, and when? Well, their plan does not include a one day. I know. So they would only have to implement what they agree to do in their plan. I would just like to point out that the district court as to that one day, and it's one of the things we hope to talk to the defense about, says that within one day, any of these people can perform this duty. It can be anyone who's called defendant's agent, a parole agent, board representative, or other agent. It seems to me that one possibility, especially in some of these remote locations where someone is not necessarily available, may be to train a member of the county jail staff that could be their agent for purposes of this quick interview for disability access. That's something I'd like to talk to the state about. We haven't had a chance to do that yet. So in other words, most of the things that have to be done within one business day and, by the way, one business day means if you're arrested on a Friday, Monday, so it's still a while, are things that defendants can do on their own computers. It's check their computer system. So are you saying that all the state would have to do is what it agrees to? Until the district court orders it to do something more. It says here in terms of implementation, within 60 days of this order, defendant shall issue the plan in its final form and disseminate it to all 58 county jail facilities. And then it says in the back, in the event the disagreement cannot be resolved, defendant shall implement the procedures as written on the day ordered and the plaintiff's counsel shall file objections. Right. So that's why in the end, if you can't agree, all they need to do on November 16th or if it's two weeks later, two weeks later, is implement what they've written. That's my position. Well, what they've written is the extent to which they feel that it's possible to comply with a court order, but if they object to the entire order, they're really objecting to everything in the plan. That has not been their position in our negotiations, and I don't think it's actually their position, but the position is there's no right to order anything. Well, I understand that that's a legal position that they may be taking. That is not a position. I wanted to correct the record. Judge Burson asked whether there have been prior orders relating to these topics, and there have been prior orders, less intrusive orders. But what about – let's take the one-day, three-day thing. If they put – they were ordered to do it in one day in their plan. If their plan says three days, then isn't their plan out of compliance with the order? In other words, that's not really a dispute about what – about implementing the order. That is a dispute with the order. So could they be held in contempt for putting three days into their order, into their plan, when they were told to put one day into their plan? I don't think that they can – well, it depends on how they proceeded. I don't think they've been proceeding in a contemptuous manner at the court. They have raised objections. They're going to speak to us about them. I'd like to meet with them about the logistical challenges. I'd like to suggest alternatives. I think if they had stood up and said we refuse to do anything whatsoever, that that would be something closer to contempt. But I also would – I would – as someone who has had a contempt motion reversed by this Court, I'm very careful about – I would not seek contempt of this particular order on a point like that. It seems to me it's not directed in the way you – Well, you have a plan that the State has drawn up now, right? I have now a second version, yes. Okay. Second version. If they implemented that plan on November 30th, are you saying you would not seek contempt? I would like to meet with them first, but I would not seek contempt for that. I would seek a further order from the Court as to if I thought there would be more jiggling here or changes there. I would stand by that. I would not seek contempt if they proceeded. Mr. Bean, I'm glad to hear that the State is attempting to negotiate with you to reach a workable plan, but ultimately at bottom of their appeal in this case is to challenge the legality of the district court's order, right? I know what you're saying, the district court doesn't have the legal authority or power to issue an order like this. And the basic challenge is that, well, the Court is imposing upon the State the obligation to enforce the ADA against other entities. And I guess the – what is the main authority the Court relied on, the regulation? Or is there something else? Well, the Court found current that both the ADA itself and the ADA regulations and her prior orders authorized this next step, which is really not an additional step. In other words, these particular prisoners and parolees have always been part of the Armstrong class. They don't leave the class at the time they go into it. I know that, but you see, apparently, this seems to be the theory of the State that, well, these are parolees in the custody of county sheriffs. So at that point, these class members become under the charge of the county sheriff. So the person – so that as far as the State's concerned, they're not violating the ADA even if the county jail facilities are lacking. It's the county sheriffs. And the Court has no legal authority to require the State to enforce the ADA through sanctions and otherwise against the counties. Now, is there something besides the regulation that the Court relied on that gives it that authority to require the State to enforce the ADA against somebody else? Well, I think it's not an order requiring this. I think what the district court was doing was saying to the State, you have power under State law, under State statutes, under State regulations. You provide money to the counties. You regulate the counties. I think the reference to fines was a reference to State law. We briefed the State law to her and showed her that there are various agencies of the CDC and other State agencies that are responsible for regulating the county jails. They provide lots of money to them. They can withhold money, which I think she was talking about. The bottom line, as I understand it, Your position is that it isn't somebody else. It's not somebody else. But even if it was somebody else, even if it was a hypothetical, even if it was a private jail or a private entity, if the State chooses to contract with them or put their people there, they have an obligation to do two things. They can either not use the facility or they can help the facility accommodate these people with the ADA. And, by the way, I think that one thing that's important here is the county jails are not here. I think the way CDCR is operating makes it very difficult for the county jails to accommodate these parolees. Here's the reason why. They're there for several months, several weeks. They come in and out. They're there completely under the control of the CDC. CDC can say one day, you know, we need them back over here. There's a hearing. Bring them over here. They're really there as they're really renting space. What we are suggesting and what I think is very important about the court's remedy, in this one-day period, the key is check your own records, CDC. Check the, and, by the way, this court in its orders has affirmed from day one that the most important issue here is identifying people and keeping them identified. Keep a tracking system. Once you have these prisoners and parolees identified, this person needs a sign language interpreter. This person needs a wheelchair. Keep them identified and provide that information to the next place that has to take care of them. So in that period, all the defendants have to do is check their computer, say, and it's all, we're finally at a point in this case, I'm happy to tell you, that where there is a that the record that we submitted shows that these particular men and women who had, did not get their accommodations in county jails did get their accommodations when they were in CDC. The system is basically, you know, working pretty well in the CDC. All they have to do is give that information to the county jail. I happen to believe that the county jails do want to comply with the ADA. They already do have plans. There are State laws that require them to do that as well as Federal laws. They're paid money, extra money to do that by the State to comply with applicable disability laws. All we're asking them to do is to use the information they have to help them out and then use their leverage. If a particular county jail just refuses, use your contractual leverage, use your statutory leverage to enforce the law and help to bring them into compliance. Right now, I think what's most horrifying about this record is no one here is disputing that my clients are in grave risk when they're in county jails. We have people sleeping on floors. This is now. This is the last two or three weeks. I'm sorry, last two or three months. No sign language interpreter to deal with doctors and therapy, excluded from programs, crawling places, in pain. That's the record that you have, and it's actually in. Of course. One reason it's even more distressing is because presumably the people who are in those jails and not for the CDC are in the same situation. Well, I suspect that that may be true, Your Honor, but I also think that this particular population is getting missed because they're from CDCR. In other words, I think they come in through a different door sometimes. I do agree that this is going to take some effort from the State. It's not going to be cost-free. We need them to devote some resources to working with the county jails, but we also put in the record that they already are. Under the Valdivia case and under this case, they already have tremendous, and by the way, in day-to-day work, there's a constant negotiations between the county jails and the State, as Judge Reinhart saw. County jails are very interested in the CDC, and they go back and forth. They're very involved. It's a single criminal justice system. As counsel said, the State made a decision that people are going to serve their pre-parole time and their after-parole time in county jails. They get credit, CDCR credit, when they're serving time in the county jails. It's part of, to some extent, it's part of the State system, and they have tremendous control that they're not currently exercising for this particular purpose because it's not a priority. ADA compliance is simply not a priority. And I'm sorry to say that at this late stage, but on this record where they're able to say, you know, the solution is go, these guys who can't get to a telephone and can't hold a sign language interpreter, go find a lawyer and sue in the two months you're in some county jail and get your own remedy. That is not a solution, and that's not appropriate. By the way, let me ask you the same question I asked Judge Russell. Who is this order directed at? Is it directed at CDC or the parole board or both? I think it's directed at both. In other words, we have the parole, they both have roles in this particular, all the entities have roles at this point. Parole agents bring people in on parole holds. They impose the hold. They have access to the same computer system. Let's say a lot of people go to jail on these parole holds based on the action of the parole department itself. They know what the disability issues are because of Armstrong requirements. They actually keep track of that themselves. They bring that person on a hold. You know, other people are arrested by the police on a new charge. The parole department then is notified so that at that point that's a little more complicated. They would have to then get the information to the county jail, but they're involved. So, Judge Hashima, I would say that this order is directed to both. The division in the case, I think, doesn't exist. I mean, the liability comes from these two different orders, but right now they're both working together on the remedial process, and, you know, parole has to work with VPH, it's called now Board of Prison Hearings, but they're all part of CDCR and they're all under the governor. So at this point, I think it's sort of this particular order, we would need cooperation from both sides. Thank you. I guess you have more. If someone tried to bring a, if one of these prisoners held in a county jail pursuant to a CDC parole hold tried to sue the county sheriff for, I'm leaving aside the ADA, but for an Eighth Amendment violation, wouldn't there, wouldn't that be, or would it be, this is the question Judge Hashima asked before, wouldn't the state, the sheriff in that instance, be regarded as part of the state and not part of the county, or would they? Does that matter in this case at all? I think so. I'm not sure it really matters for this purpose. I'm sure the sheriff would say to the state, this is your guy, too. He'll bring them in, too. I think everyone agrees that there's some ---- But for Eleventh Amendment purposes, that's really how it comes up. Right. Right. And my understanding is, as I said, that there was a California Supreme Court case four or five years ago. But I'm not sure of the exact circumstances. I mean, I think most of the ---- As a subdivision of the state rather than, or an entity of the state. Most of that Eleventh Amendment law, I mean, has the damages versus injunctive relief. Right. But you don't know the answer, so. I don't know the answer. I'm sorry. One thing I'd like to, that didn't come through in our stay briefing that was in, that was  I think something that occurred to me as I was reading it last night is that in, the Supreme Court in Olmstead dealt with the regulations. Didn't read on, didn't ever reach an issue about whether they were ultra-virus or not, because no one, either the parties addressed that. But they talked very carefully about the part of the ADA that authorized the Justice Department to draft regulations. And also the part that said that, in the ADA itself, said that the regulations should be drafted in conformance with the 504 regulations, the Rehab Act regulations. The Rehab Act regulations themselves had this provision in it. The provision saying you can't get out of a liability as a governmental entity if you, by contracting with another party. This is at 527 U.S. 581, pages 591 to 3. It's this idea that, to the extent the Congress in directing the Justice Department to look to the Rehab Act regulations and draft the ADA regulations was, to some extent, a blessing of those existing regulations and endorsement of them. Certainly, we know of no case that has challenged these regulations of ultra-virus. And they're certainly well within the power of the Justice Department. And they're completely consistent with the ADA itself. As to the Prince case in the Tenth Amendment argument, you know, this is not a case where Congress has passed a law and said to the state government, you must enforce this law against the counties. This is a case where a federal district court, affirmed by this court, has found that the state of California violated the ADA and the Rehab Act in various ways in the way it runs its prisons. And it's still in violation today. And this is a federal district judge who says, you must, for people who are your people, your parolees, your prisoners, you are responsible for complying with the ADA, not the county jail. So it's not, there's no effort here in this order for the CDCR or the state government to take on some new duty under the ADA Rehab Act. This is an order directed at the defendants who have been found guilty of violating these federal laws and are still, today, there's still current evidence of ongoing violations, the same kind of violations. You're not telling the county that it has to treat its own prisoners that way, are you? Or its own detainees? No, not at all. This is, this remedy goes only to the CDCR parolees. And I think that there's a lot of ways, a lot of flexibility in this order. And I would hope there would be a lot of flexibility in the plan. Some counties may be perfectly fine. They don't need anything. Some counties might need to have their grievance process adjusted so the CDCR prisoners know about it. I'm afraid in some places they're not given any information about the local grievance process. So I think there's some people falling through the cracks. This is a group of men and women who have been falling through the cracks. Let me just ask you one more question. Again, I'm not quite clear. You're still negotiating. And you're hoping to get through the negotiations by November 30th. But if they're like other negotiations, they may well continue to pass then. When would the county be required to put this one day or three day, whatever, into actual effect? Well, one part of their plan is an implementation schedule. And that's one of the things that we need to talk about. When are you going to be able to actually do that? We know that there are various limitations to what the state can do. They can't just snap their fingers and put a program in place. And so we would work with them on what's a reasonable schedule for implementing. In other words, you're saying when does the rubber meet the road? When is someone actually going to get the benefit of this order? I hope really soon. But I know the reality is that's going to take some time. And what the court order says is you must disseminate it, disseminate your plan. But the plan itself has a schedule in it. You know, if they have to modify a computer program, that's going to take some time. Or they have to hire some people, it might take some time. And I think the way we understand the court order, it contemplated them coming up with a plan, but it wasn't ñ she didn't expect and nor do we expect that they're going to snap their fingers and suddenly have a plan that is ready to be fully implemented on day one. Or even at all. I mean, there's nothing in the order that says when they have to start doing whatever they're going to do. That's my understanding, Your Honor. I mean, there's some urgency here. There's some urgency and there's some things they had to do. They had to send out this letter, which they did. And there's some other things that they need to do. And, again, I'm not going to ñ I don't want to be representing to anyone that I'm going to be casual about enforcing this order. I think it needs to be moved forward as rapidly as possible. But I also don't want something put out there that is not appropriate. Not appropriate, it's not going to work logistically. I don't want to have 50 angry counties in the case. I want them to work with them. In other words, it's much more positive to get a result through a negotiation with the counties and to find out what the problems are than it is to try to force the counties to do something. I think. Speaking of as rapidly as possible, if, hypothetically speaking, if we grant the stay, would you want the bill to be expedited? Yes, Your Honor. So you both want it expedited, assuming you lose, right? Okay. It would not, I would suspect, take a long time before there could be a hearing. I mean, you both have been briefing this issue for, what, 20 years? If there's nothing further, Your Honor, thank you. Thank you. Your Honors, I'd like to just make one point in response to some of Mr. Bean's arguments. Had this order simply been an order requiring the parties to meet and confer over a potential plan, I don't think that we would have the urgency that we have in this case, and I do not, I would not be making an urgent motion for a stay before this Court. But as we submitted in our reply brief, the district court has indicated that it intends to institute contempt proceedings to the extent that its orders are not followed. And we have an order here that requires the drafting of a plan, and again, as we discussed, rapid implementation of that plan that needs to be stated. Where's the rapid implementation? What does this plan, what does the order say about the speed of the implementation? The order says to the extent that the parties can't agree, that the defendants are to implement the plan. Okay. Now, there's not a date on that. But it's a plan, right? So it doesn't say you have to do it. It says you have to have a plan to do it. That's correct. Kagan. So if you were to say that we can't do this one-day thing for three months, would that, where would that leave you? Well. I'm not suggesting you do that, but it's a, it, this order does not set time limits for when you have to do something. It sets time limits for when you have to have a plan about doing something. That's correct. And to the extent the plan doesn't satisfy either the district court or plaintiff's counsel, I anticipate that there will be contempt proceedings. But it hasn't every contempt proceedings about a time limit that's not in the plan order. For not having followed the district court's clear directives. Counsel said that in the plan there's an implementation schedule. Is that correct? I don't know of an implementation schedule, Your Honor. I know what the order states. No, not the order. Your plan. Pardon? The plan you circulated. Does that have an implementation schedule? It does not, Your Honor. It does not. It doesn't with specific dates. For example, January 1st, February 1st, that kind of thing. No, it does not. But this is what I'm not understanding. The order says that within 45 days you should develop a plan for ensuring, for doing all this. Right? It doesn't, and it says that within 60 days you have to issue the order in final form and disseminate it, issue the plan and disseminate it. But it doesn't say in this order that on that day you have to do all of this. So how could it? You're saying you're being contempt if the plan didn't say that is what you're saying. If the plan doesn't meet these very detailed specific provisions, I could anticipate I could see the court. The court, I believe, would have a defense. That's different. You said a minute ago that you have to, not only did you have to circulate the plan, but you had to implement it as soon as possible. Is that? I apologize if I gave the court that impression, Your Honor. No. So there's nothing that says when it has to be implemented? Not within the order, Your Honor. What it says is that to the extent that the disagreements between the parties cannot be resolved, defendants shall implement the procedures as written on the date ordered. And what is that, the date ordered? I don't know, Your Honor. Well, it seems that you're in pretty good shape for resisting a contempt proceeding that your opponent's not going to bring anyway. Your Honor, the point is, is that if the stay is issued, these very serious legal matters can be sorted out. And if they're not, they can still be sorted out as far as I can tell. Well, they could be, but the point is. We'll save you the $22 million anyway. Thank you very much, Your Honor. Thank you. Today the court will stand in recess. All rise. The court shall stand in recess.
judges: Reinhardt, Tashima, Berzon